UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

JILL STEVENSON,                                                      Case no. 19-12869-t7

      Debtor.

JILL STEVENSON,

      Plaintiff,

v.                                                                    Adv. no. 19-1085-t

EDUCATIONAL CREDIT
MANAGEMENT CORPORATION,

      Defendant.

## OPINION

Before the Court is Debtor's complaint for an "undue hardship" discharge of her student loans. Defendant Educational Credit Management Corporation (ECMC), the guarantor of the loans, opposes the relief sought. After a trial, the Court concludes that excepting Debtor's student loans from discharge will not impose an undue hardship.

A.     Facts.[1]

Debtor is 54 years old, single, and has no children or dependents. In 1998 she graduated from St. Lawrence University in Canton, New York, with a Bachelor of Science in Psychology. As an undergraduate, Debtor borrowed approximately $37,000 in "Stafford loans," which are insured by the United States Department of Education (the "DOE"). From 1998 to 2019 Debtor

---

[1] The Court takes judicial notice of its docket in this case. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may sua sponte take judicial notice of its docket).

was enrolled in an income contingent repayment plan ("ICRP") that allowed her to pay $160 to $170 a month until the end of the repayment term. Having satisfied the requirements of that ICRP, Debtor now owes nothing on her undergraduate loans.

In 2002 Debtor enrolled at the Thomas Cooley Law School in Lansing, Michigan. After completing all but the last quarter of her coursework, Debtor was academically dismissed. She never went back to law school.

Debtor paid for law school by taking out $90,928.60 in Stafford loans. In 2006, Debtor enrolled in a 25-year ICRP for her law school loans. She has made the required monthly payments for the past 15 years. Her current ICRP payment is $259.84 a month. If she continues making the payments the outstanding balance will be forgiven in about 10 years. At present the loan balance, which continues to accrue interest, is about $119,000. Under current tax laws, forgiveness of the outstanding balance (which Debtor estimates will be $121,000 at the end of the repayment period) would be taxable gross income. 26 U.S.C. § 61(a)(11).[2] Debtor's tax liability on the debt forgiveness would be about $28,500.[3]

After law school, Debtor moved to Albuquerque and began working as a paralegal. Except for a 7-8-month gap in employment in 2013-2014, Debtor has worked as a paralegal for the past 15 years. Currently she is the office manager and senior paralegal at an Albuquerque law firm. Her salary is about $41,000 a year. Although it is stressful at times, Debtor is good at and likes her job.

---

[2] This issue was discussed in the Court's opinion partially granting ECMC's motion for summary judgment. *See In re Stevenson*, 2020 WL 6122749, at *5-6 (Bankr. D.N.M.).
[3] Calculated assuming that Debtor's salary increases slightly over the next ten years and that the marginal tax rates stay the same.

She does not anticipate leaving. Every indication is that Debtor will be able to continue working full time and maintain or raise[4] her income.

Debtor has 75% hearing loss in both ears. She uses hearing aids and she is a lip reader. Her hearing likely will not improve. Sometimes Debtor's hearing loss makes it difficult for her to communicate with her colleagues. As a one-time benefit, her employer bought her the hearing aids she now uses. Debtor has medical and dental insurance through her employer. Other than needing some dental work, Debtor is in good health.

Debtor drives a 2005 Nissan X-Terra with a salvage title, worth about $500. The vehicle needs cosmetic repairs but generally is in good working order.

Debtor has a 401k account worth about $24,000 and a Merrill Lynch account worth about $9,200. Her parents give her $500 every Christmas.

Debtor lives with her parents in a nice house, owned by them, in an affluent Albuquerque neighborhood. She does not pay rent. Debtor assists her parents, who are in their 80s, by doing yardwork and helping around the house.

Debtor would prefer to live alone. She testified that while the ICRP payment is "manageable," she cannot afford her own place. However, there is no evidence that Debtor's current living arrangement is unworkable. Indeed, as her parents age Debtor may need to live with them to help out.

Debtor is one of four children. Eventually, Debtor likely will inherit one quarter of her parents' estate, which is worth about $4 million.

---

[4]Presumably Debtor's salary will increase over time. The evidence is that Debtor is a valuable employee.

Debtor filed this chapter 7 case on December 15, 2019. She received a discharge on March 26, 2020.

Debtor filed this proceeding on December 16, 2019, seeking an "undue hardship" discharge for her student loan debt. Her initial theory was that, because her ICRP payment was so low, her loan balance was increasing over time, creating an undue hardship. The Court granted partial summary judgment in favor of ECMC on that theory, but allowed Debtor to amend the complaint. *See In re Stevenson*, 2020 WL 6122749, at *6 (Bankr. D.N.M). Debtor filed an amended complaint, asserting that her monthly ICRP payment is an undue hardship.

Debtor relies on her bankruptcy schedule J, which lists the following monthly expenses:

| Phone and Internet | $208.00 |
| Food and Housekeeping | $1,200.00 |
| Clothing, laundry, dry cleaning | $20.00 |
| Personal Care | $20.00 |
| Medical/Dental Expenses | $125.00 |
| Transportation | $150.00 |
| Car Insurance | $82.86 |
| Entertainment | $80.00 |
| Personal Secured Loan Repayment | $399.06 |
| Health and Dental Insurance | $392.25 |
| Student Loan Repayment | $259.84 |
| FirstMark Bar Loan | $81.89 |
| Total | $3,018.50 |

The FirstMark bar loan was an $11,000 loan from a private lender to cover the costs of preparing for and taking the bar exam. It is not a nondischargeable student loan. Having received a chapter 7 discharge, Debtor is no longer obligated to make that payment.

Likewise, the "personal secured loan repayment" expense is discretionary. In May 2018, Debtor borrowed $17,500, at 4.5% interest, from her friend Robert Custer. Debtor signed a promissory note granting Custer a security interest in her 2005 Xterra and various valuables (lead crystal, sterling silver, porcelain figurines, jewelry, ivory netsukes, antique books and bibles, and

ivory portraits). Custer filed a UCC financing statement reflecting his lien on the Xterra and the valuables, which he later amended to delete the Xterra.[5] According to the promissory note, Debtor's repayment obligation is $399 per month. If Debtor continues paying the Custer loan, which she intends to do, the debt will be fully paid in May 2021.

Debtor lives somewhat frugally—she does not go to movies, cuts her own hair, and buys new clothes and shoes only when necessary. She only occasionally eats out during the work week, and she never goes out to dinner. On the other hand, Debtor spends $1,200 a month for "food and housekeeping supplies." This includes about $600 a month for beer and cigarettes. For entertainment, Debtor plays games on her phone, at an average monthly cost of about $170.[6] Debtor shops online for discretionary items at a varying monthly cost.

B.   Repaying Student Loans Through an Income-Contingent Repayment Plan.

The William D. Ford Federal Direct Loan Program, enacted in 1994, is codified at 20 U.S.C. § 1087a-h. 20 U.S.C. § 1087e(d) provides in part:

> (d) Repayment plans.
>    (1) Design and selection.
> Consistent with criteria established by the Secretary [of Education], the Secretary shall offer a borrower of a loan made under this part a variety of plans for repayment of such loan, including principal and interest on the loan. The borrower shall be entitled to accelerate, without penalty, repayment on the borrower's loans under this part. The borrower may choose--
>       (A) a standard repayment plan, consistent with subsection (a)(1) of this section and with section 1078(b)(9)(A)(i) of this title;
>       (B) a graduated repayment plan, consistent with section 1078(b)(9)(A)(ii) of this title;
>       (C) an extended repayment plan, consistent with section 1078(b)(9)(A)(iv) of this title, except that the borrower shall annually repay a

---

[5] When she filed her bankruptcy petition, the remaining balance on the Custer loan was $6,716.26. In her bankruptcy case, Debtor filed a "Statement of Intention" in which she elected to "retain and continue to pay" her personal loan from Custer. In light of Debtor's bankruptcy discharge, Custer's claim is *in rem* only.

[6] Debtor filed this bankruptcy case in December 2019. This average is based on Debtor's bank statements for the three months before this case was filed.

> minimum amount determined by the Secretary in accordance with section 1078(b)(1)(L) of this title;
>
> (D) an income contingent repayment plan, with varying annual repayment amounts based on the income of the borrower, paid over an extended period of time prescribed by the Secretary, not to exceed 25 years . . . .

The statute makes clear that ICRPs "repay" student loans just as the standard, graduated, and extended repayment plans do.

C. The Undue Hardship Standard.

> Federal government student loan programs began in 1958. In 1973, to curb perceived abuses, the Commission on the Bankruptcy Laws of the United States recommended that "educational loans be nondischargeable unless the first payment falls due more than five years prior to the petition." H.R. Doc. No. 93–137 (1973), *reprinted in* B App. Collier on Bankruptcy, pt. 4(c), at 4–432 (15th rev. ed. 2008). Congress enacted this recommendation in the Bankruptcy Reform Act of 1978. Pub. L. No. 95–598, § 523(a)(8), 92 Stat. 2549, 2591 (1978), codified at 11 U.S.C. § 523(a)(8). In 1990, Congress lengthened from five to seven years the period beyond which government-assisted student loans became automatically dischargeable. Pub. L. No. 101–647, § 3621, 104 Stat. 4789, 4964–65 (1990), amending 11 U.S.C. § 523(a)(8)(A). Then, in the Higher Education Amendments of 1998, Congress eliminated this time limitation, making "undue hardship" the only exception to non-dischargeability. Pub. L. No. 105–244, § 971(a), 112 Stat. 1581, 1837 (1998).

*In re Jesperson*, 571 F.3d 775, 778 (8th Cir. 2009).

Section 523(a)(8)[7] now provides that student loans are excepted from discharge unless the debtor proves that "excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents[.]"

> A debtor seeking to discharge government-guaranteed educational loans thus faces a difficult burden, because she must show that not discharging the debt would impose an undue hardship. Congress, however, neither defined 'undue hardship' nor provided standards for what it entails. . . . Nonetheless, the ordinary meaning of 'undue' gives us clear guidance. 'Undue' generally means 'unwarranted' or 'excessive.' *See The Random House Dictionary of the English Language* 2066 (2d ed. 1987). Because Congress selected the word 'undue,' the required hardship under § 523(a)(8) must be more than the usual hardship that accompanies bankruptcy. Inability to pay one's debts by itself cannot be sufficient; otherwise all

---

[7] Unless otherwise noted, statutory references are to 11 U.S.C.

bankruptcy litigants would have undue hardship. The exception would swallow the rule, and Congress's restriction would be meaningless. As a result, '[t]he existence of the adjective 'undue' indicates that Congress viewed garden-variety hardship as insufficient excuse for a discharge of student loans.' *Rifino v. United States* (*In re Rifino*), 245 F.3d 1083, 1087 (9th Cir. 2001) (internal quotation marks omitted).

*In re Frushour*, 433 F.3d 393, 399 (4th Cir. 2005); *see also In re Thomas*, 931 F.3d 449, 454 (5th Cir. 2019) (debtor must show that the debt imposes "intolerable difficulties . . . . greater than the ordinary circumstances that might force one to seek bankruptcy relief").

"[B]ankruptcy courts use a wide variety of tests to determine whether the debtor has demonstrated undue hardship," which have "received varying degrees of acceptance." *In re Faish*, 72 F.3d 298, 302 (3d Cir. 1995); *see also In re Woodcock*, 45 F.3d 363, 367 (10th Cir. 1995) (identifying various tests). The Tenth Circuit adopted the test in *Brunner v. New York State Higher Educ. Serv's Corp.*, 831 F.2d 395 (2d Cir. 1987). *See Educ. Credit Mgm't Corp. v. Polleys*, 356 F.3d 1302, 1309 (10th Cir. 2004) ("We . . . join the majority of the other circuits in adopting the *Brunner* framework.").

The *Brunner* test requires a debtor claiming undue hardship to show:

(1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

831 F.2d at 396.

However, the *Polleys* court also held:

[T]o better advance the Bankruptcy Code's 'fresh start' policy, and to provide judges with the discretion to weigh all the relevant considerations, the terms of the test must be applied such that debtors who truly cannot afford to repay their loans may have their loans discharged. Additionally, we think that the good faith portion of the *Brunner* test should consider whether the debtor is acting in good faith in seeking the discharge, or whether he is intentionally creating his hardship.

356 F.3d at 1309.

The debtor must satisfy all three *Brunner* elements. *In re Regan*, 590 B.R. 567, 573 (Bankr. D.N.M. 2018). Failure to do so renders the debt nondischargeable. *Id.*

D.  *Brunner* Element #1: Minimal Standard of Living.

"A minimal standard of living means living within the strictures of a frugal budget" sufficient to meet the debtor's need for "food, shelter, clothing and medical treatment." *Regan*, 590 B.R. at 574. A mere showing of "tight finances" will not suffice. *Faish*, 72 F.3d at 306. In the context of this analysis, debtor's expenses should not be regarded as unalterable. Rather, "[t]he proper inquiry is whether it would be unconscionable to require the [d]ebtor[] to . . . earn more income or reduce [her] expenses." *In re Goforth*, 466 B.R. 328, 336 (Bankr. W.D. Pa. 2012) (citing *Faish*, 72 F.3d at 307). "Debtors cannot satisfy this prong if they could make the loan payments by engaging in some short-term belt tightening." *Goforth*, 466 B.R. at 335; *see also In re L.K.*, 351 B.R. 45, 53 (Bankr. E.D.N.Y. 2006) (courts should apply common sense to the circumstances of each case in examining the "minimal standard of living" factor).

Debtor's income allows her to maintain a minimal standard of living while satisfying her ICRP obligation. Debtor conceded this at trial.[8] That Debtor would prefer to live alone does not mean that her standard of living is less than the required minimum; her preference does not take priority over the obligation to repay her student loan. *See, e.g.*, *In re Block*, 273 B.R. 600, 607 (Bankr. W.D. Mo. 2002) ("While owning a home is a major part of the American dream . . . it should not come at the expense of the [d]ebtor's student loan creditors[.]"); *In re Nixon*, 453 B.R. 311, 328 (Bankr. S.D. Ohio 2011) ("home-owning debtors must, if they can, move to more

---

[8] Debtor's trial testimony is consistent with her initial responses to ECMC's interrogatories about the basis of her undue hardship claim, where Debtor stated: "The monthly income-based payment amount, in and of itself, does not present a hardship." Elsewhere she stated that $259.84 a month is the most she believed she could pay toward her student loans without an undue hardship. *Stevenson*, 2020 WL 6122749, at *2.

affordable housing"); *In re Sperazza*, 366 B.R. 397, 409 (Bankr. E.D. Pa. 2007) (although debtor was "dissatisfied" with living with his parents, "the present ability to pay factor does not presume that a debtor cannot maintain a minimal standard of living simply because he is residing with and receiving support from relatives"); *see also Jesperson*, 571 F.3d at 780 (applying the totality-of-the circumstances test, and holding that "[a] debtor making a good faith effort to repay loans would continue to live with his brother to save money").

Further, Debtor could significantly reduce her monthly expenses without foregoing necessities. Eliminating the FirstMark bar loan repayment and the repayment to Custer—both of which Debtor continues to pay even though they were discharged in bankruptcy—would reduce Debtor's monthly expenses by $480. This would result in a budget surplus of almost $200. Debtor's decision to repay Custer should not be at the expense of taxpayer dollars that fund the Stafford loan program. *In re Faish*, 72 F.3d at 305-06 ("[T]he *Brunner* standard safeguards the financial integrity of the student loan program by not permitting debtors who have obtained the substantial benefits of an education funded by taxpayer dollars to dismiss their obligation merely because repayment of the borrowed funds would require some major personal and financial sacrifices."); *In re O'Hearn*, 339 F.3d 559, 564 (7th Cir. 2003) (same); *In re Cehula*, 327 B.R. 241, 247 (Bankr. W.D. Pa. 2005) (debtor's feeling that he had a "filial obligation" to repay a loan from his parents was not a factor in whether he could maintain a minimal standard of living); *Block*, 273 B.R. at 606 (same); *see also In re Lozada*, 594 B.R. 212, 224 (Bankr. S.D.N.Y. 2018) (a debtor who elects to tithe and make charitable donations rather than pay non-dischargeable debt is "making donations using someone else's money").

-9-
Case 19-01085-t    Doc 82    Filed 04/02/21    Entered 04/02/21 15:47:06 Page 9 of 15

In addition, Debtor could reduce her $1,200 monthly food and housekeeping expense. It is not "minimal" for a single person to spend $1,200 a month on food and housekeeping supplies.[9] Considering that half of this budget is discretionary (alcohol and cigarettes), Debtor could trim her budget easily to make her ICRP payment. Discretionary expenses are not necessary for a minimal standard of living. *See e.g., In re Young*, 563 B.R. 540, 553 (Bankr. W.D. Ark. 2016) (undue hardship not shown where monthly expenditures on alcohol and cigarettes could be reduced); *In re Brooks*, 406 B.R. 382, 391 (Bankr. D. Minn. 2009) ("Cigarettes are not a reasonable necessary living expense."); *In re Williams*, 233 B.R. 423, 429 (Bankr. W.D. Mo. 1999) (cigarettes are a "luxury expense"); *Jesperson v. U.S. Dep't of Educ., et al.*, 366 B.R. 908, 912 (Bankr. D. Minn. 2007) (cigarettes are not part of a "basic needs budget"), *rev'd on other grounds*, 571 F.3d 775; *In re Campton*, 405 B.R. 887, 891-92 (Bankr. N.D. Ohio 2009) (monthly expenditures on cigarettes, cable television, and a boat payment could be reallocated to student loan payment); *In re Mosko*, 515 F.3d 319, 325 (4th Cir. 2008) (satellite television, a YMCA membership, and cigarettes are not necessary to maintain a minimal standard of living); *ECMC v. Beattie*, 490 B.R. 581, 587 (W.D. Wash. 2012) (organic groceries are not necessary to a minimum standard of living); *In re Gill*, 326 B.R. 611, 636 (Bankr. E.D. Va. 2005) (same). By reducing her food and housekeeping budget by one-fourth, Debtor could satisfy her monthly ICRP payment and have plenty left over.

For the foregoing reasons, Debtor has not satisfied the first element of *Brunner*.

E.  *Brunner* Element #2: The Likelihood that Debtor's Current Financial Circumstances Will Persist for a Significant Portion of the Repayment Period.

---

[9] For example, the United States Department of Agriculture's "Official USDA Food Plans: Cost of Food at Home at Four Levels, U.S. Average, January 2021" estimates that the monthly cost of food for a female, age 51-70 ranges from "Thrifty" ($170.90) to "Liberal" ($320.20). Were Debtor to reduce her monthly grocery bill by $300, for example, she could still have a $900 a month food budget—almost three times as much as the USDA's "liberal" cost of food at home for a woman her age. *See* https://www.fns.usda.gov/cnpp/usda-food-plans-cost-food-reports-monthly-reports.

Although Debtor's ICRP continues for ten more years, her financial situation should improve soon. The Custer loan will be paid in May 2021, giving Debtor an extra $400 a month. Discharge of the FirstMark loan added an additional $81 a month. Debtor's salary, which seems modest for someone with her skill and experience, should increase over time. Finally, at some point Debtor likely will inherit a tidy sum. Debtor did not satisfy the second *Brunner* element.

F.  *Brunner* Element #3: Debtor's Good Faith Efforts to Repay the Loans.

Debtor is on more solid ground with the good faith element. First, she entered into an ICRP, which generally is viewed as making a good faith effort to repay a student loan. *See, e.g.*, *In re Roe*, 295 F. App'x 927, 937 (10th Cir. 2008) ("a debtor's willingness to participate in a repayment plan is an important indicator of good faith"); *In re Alderete*, 412 F.3d 1200, 1206 (10th Cir. 2005) (same). Second, she has made her payments faithfully for 15 years, which also shows good faith. *See, e.g., In re Birrane*, 287 B.R. 490, 499 (9th Cir. BAP 2002) (paying on the loan is not dispositive but is an important factor). Debtor satisfies the good faith element of *Brunner*.

G.  Debtor's Argument Based on *Metz* is Not Well Taken.

Debtor also argues for a hardship discharge because her monthly payments are less than the interest accruing on the loans, so her loan balance keeps going up. In support of this argument Debtor cites *In re Metz*, 589 B.R. 750 (Bankr. D. Kan. 2018). In dicta, the *Metz* court stated, when discussing ICRPs:

> I agree with ECMC that there is room in Ms. Metz's budget for her to pay something on this debt. But that 'something' should have a meaningful positive effect on her financial situation. In other words, she should be able to reduce the debt—not simply service it.

*Id.* at 756. Elsewhere the Court stated that Metz's ICRP does "not service the debt at all, but instead yield[s] a negative amortization of -$301 each month[.]" *Id.* at 758. The view that ICRPs do not repay student loans also is stated in *In re Murray*, 563 B.R. 52, 59 (Bankr. D. Kan. 2016) (payments

-11-
Case 19-01085-t    Doc 82    Filed 04/02/21    Entered 04/02/21 15:47:06 Page 11 of 15

under an ICRP do "not constitute payment of the student loan debt"), *aff'd*, 2017 WL 4222980 (D. Kan.); and *In re Goodvin*, 2020 WL 6821867, at *8 (Bankr. D. Kan) (debtor's income-based repayment plan "won't even 'repay' the interest accruing each month on the student loan debt"), *aff'd*, 2021 WL 1026801 (D. Kan.). Based largely on the holding that ICRPs do not repay student loans, the courts in *Metz*, *Murray*, and *Goodvin* used § 105(a) to discharge portions of the debtors' student loans.[10]

The Court respectfully disagrees with the conclusion that ICRPs do not "repay" student loans. First, the statute says that an ICRP is one way to repay a student loan. 20 U.S. C. § 1087e(d)(1)(D). To follow the *Metz/Murray/Goodvin* line of cases, the Court would have to ignore the plain language of the statute.

Second, most courts applying *Brunner* view ICRP payments as loan repayments. *See, e.g., In re Hlady*, 616 B.R. 257, 272 (Bankr. E.D.N.Y. 2020) ("Where a debtor is eligible to enroll in an income-based repayment program, the debtor must demonstrate how she will be unable to make the limited payments required under the formula and still maintain a minimal standard of living."); *In re Chance*, 600 B.R. 51, 58 (Bankr. S.D. Ind. 2019) ("A court may consider whether the debtor can pay an amount under an IBR plan and still maintain a minimal standard of living."); *In re Conner*, 526 B.R. 218, 225 (Bankr. E.D. Mich. 2015) ("the relevant inquiry [under the first prong of the *Brunner* test] is whether the [p]laintiff could make the monthly payment as required by an income-based repayment plan"); *In re Murrell*, 605 B.R. 464, 471 (Bankr. N.D. Ohio 2019) (debtor could not satisfy first prong of *Brunner* because "repayment of the student loans under an income-

---

[10] In *Metz* and *Murray* the court discharged all accrued interest on the loans but not the principal. It is not clear that using § 105(a) to partially discharge student loan debt, which arguably was approved by the Tenth Circuit in *In re Alderete*, 412 F.3d at 1207, survived *Law v. Siegel*, 571 U.S. 415, 421 (2014) ("§ 105(a) 'does not allow the bankruptcy court to override explicit mandates of other section of the Bankruptcy Code.'").

based repayment plan" was possible); *In re Augustin*, 588 B.R. 141, 150-51 (Bankr. D. Md. 2018) (debtor could not satisfy first prong of *Brunner* because he could afford monthly ICRP payments); *In re Gesinde*, 2019 WL 5090080, at *5 (Bankr. S.D. N.Y.) (same). The *Metz/Murray/Goodvin* interpretation undercuts the ICRP program.

Third, even if a lender agrees to accept a discounted payoff in full satisfaction of a loan, it is reasonable nonetheless to consider that the loan has been "repaid" once the discounted payoff is tendered. An ICRP is a form of discounted payoff.

The *Metz*, *Murray*, and *Goodvin* courts were bothered by two aspects of ICRPs. First, they note that under many ICRPs the loan balance *increases* over time as the debtor makes the agreed-upon payments. While true, ICRPs nevertheless repay student loans. The difference is that with an ICRP the loan balance is eliminated at the end of the repayment period, in one fell swoop. Before then, the increasing loan balance reflects the size of the monthly payment discount given to borrowers. Further, the increasing balance is not a problem unless the borrower defaults, and ICRPs make it relatively easy to avoid default.

The other aspect of ICRPs that bothered the *Metz*, *Murray*, and *Goodvin* courts is the potential income tax liability at the end of the repayment period. That could be a problem for debtors in some cases, depending on the tax laws at the time and the debtors' tax attributes, income, and net worth. The Court does not believe, however, that the potential tax liability means that ICRPs do not repay student loans. Rather, the potential liability is one of the conditions borrowers agree to in exchange for the benefits of an ICRP.

While the ICRP drawbacks identified in *Metz*, *Murray*, and *Goodvin* are real, ICRPs have two huge advantages over standard repayment plans. First, the monthly payments are much lower. In Debtor's case, for example, her ICRP monthly payment is $260, compared to about $1,000 a

month under the standard repayment plan. Second, the total amount paid often is lower. Again using Debtor as an example, her total payments under a standard repayment plan would have been about $120,000 (ten years at $1,000 a month). Under her ICRP, in contrast, her total payments will be about $78,000. Even if the tax laws do not change in the next ten years and Debtor has to pay $28,500 of federal income tax in 2031, Debtor's total payments would still be less than under a standard repayment plan.[11] For many borrowers like Debtor, an ICRP is an attractive repayment alternative and the only feasible one.

Furthermore, as the Seventh Circuit noted in *Krieger v. Educational Credit Management Corp.*, 713 F.3d 882, 884 (7th Cir. 2013), "[i]t is important not to allow judicial glosses, such as the language in *Roberson* and *Brunner*, to supersede the statute itself."[12] The ultimate question is whether excepting Debtor's student loan from discharge imposes an undue hardship. With Debtor's ICRP, the answer is no. The *Metz*, *Murray*, and *Goodvin* courts may have gotten sidetracked deciding if ICRPs "repay" student loans. While reasonable minds may differ on that point, there can be little doubt that ICRPs substantially lessen the hardship caused by student loan debt, and in most cases the availability of an ICRP takes student loans out of the "undue hardship" exception of § 523(a)(8).

---

[11] The discount is even greater under a present value calculation. The present value of payments under the standard repayment plan (ten years at $1,000 per month), discounted at 5%, is $92,660. The present value of Debtor's ICRP plan payments, in contrast, is $43,973, or 47% of the present value of the standard repayment plan payments. Even if Debtor has to pay tax on the forgiven debt after 25 years the present value of her payments would be about $52,389, or 56.5% of the present value of the standard repayment plan payments.

[12] The reference to *Roberson* is to *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993), in which the Seventh Circuit adopted the *Brunner* test.

## Conclusion

Federal student loans have metastasized from a small program in the 1950s into a behemoth that inflicts permanent financial damage on many borrowers, distorts higher education markets, and costs taxpayers billions of dollars a year. In recent decades the primary beneficiaries of the program have been the universities, which have enriched themselves while increasing the cost of education far more than the rate of inflation. Some students benefit from government loans, to be sure, but far too many students borrow heavily to pay for outrageously expensive but valueless degrees. Predictably, these students find that they cannot repay the loans on any standard, extended, or graduated repayment terms. Their only options are to default or enroll in an ICRP. While ICRPs provide substantial relief to borrowers, they are nevertheless a long-term financial burden. The Court regrets this pernicious system.

Debtor has been caught in the student loan trap for 23 years. While she may have benefited from her legal education to some extent, the Court suspects that Debtor's considerable skills as a paralegal and office manager are due primarily to intelligence, hard work, and on-the-job training. It is too bad she or her law school did not realize much sooner that pursuit of a J.D. was not a good fit. In any event, the evidence shows that paying her ICRP is a hardship on Debtor but not an undue one. The Court will enter judgment for ECMC.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: April 2, 2021
Copies to: counsel of record